ALLEGHENY VALLEY SCHOOL,
Petitioner

v.

DEPARTMENT OF PUBLIC
WELFARE, Respondent.

Commonwealth Court of Pennsylvania.

Argued Dec. 9, 2013.

Decided Jan. 8, 2014.

(Pa.Cmwlth.2004).

John A. Kane, Harrisburg, for petitioner.

Jeffrey P. Schmoyer, Senior Counsel, Harrisburg, for respondent.

BEFORE: LEAVITT, Judge, and BROBSON, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Senior Judge FRIEDMAN.

Allegheny Valley School (AVS) appeals from the April 17, 2013, final order of the Secretary of the Department of Public Welfare (DPW), which upheld the Bureau of Hearing and Appeals' (BHA) denial of AVS's administrative appeal. We affirm.

AVS is a non-profit facility that provides residential care, habilitation, and treatment to more than 900 children and adults with intellectual and behavioral health disabilities (commonly referred to as "intermediate care facility services for persons with intellectual disabilities" or "ICF/ID").

Non-state-operated ICF/IDs, such as AVS, receive payment from DPW in accordance with DPW's regulations. In 2008, 82% of AVS's total revenue came from the Pennsylvania Medical Assistance Program and 12% came from county programs.

On May 30, 2008, NHS Human Services acquired AVS. Before the acquisition, AVS's Board of Directors (Board) had authorized the transfer of money held in a funded depreciation account [1] to a deferred compensation plan created for AVS's chief executive officer (CEO), who had been with AVS since 1960. The Board's intent was to provide the CEO with a retirement benefit comparable to that of CEOs of similar non-profit health care organizations. A national compensation consulting firm, the Hay Group, developed the deferred compensation plan. According to the Hay Group's findings, the inclusion of the deferred compensation plan as part of the CEO's compensation package placed him near the 50th percentile of similarly situated CEOs.

In order to fund the CEO's deferred compensation plan, in May 2008, AVS transferred all of the money held in its funded depreciation account, totaling $3,402,670, to the deferred compensation plan and closed the depreciation account. Of that total, $905,806 represented investment income that had been earned on the account. The total value of the CEO's deferred compensation plan, accrued leave payout, and severance package was approximately $3,648,000.

DPW's Bureau of Financial Operations (BFO) conducted an audit of the deferred compensation plan and issued a report on May 19, 2010. While BFO ac-

---

1. A funded depreciation account holds funds accumulated for the future acquisition of depreciable assets used in rendering patient care or for other capital purposes related to patient care. DPW does not reimburse an ICF/ID for a funded depreciation account; rather, the accumulated funds are the provider's assets and may be used for any board-approved purpose. (See DPW's Findings of Fact, No. 12.)

knowledged AVS's right to establish the deferred compensation plan, as well as the plan's reasonableness, BFO recommended that the interest income earned on the funded depreciation account be subject to offset in accordance with section 226.4.B of the Medicare Provider Reimbursement Manual (HIM–15).[2] BFO rejected AVS's proposal to place the full amount of the investment income, plus interest, into a restricted capital development account because that is not expressly provided for in the regulations.

On August 26, 2010, DPW's Office of Developmental Programs issued a decision incorporating BFO's audit report and notified AVS that the amount of investment income in the funded depreciation account at closure—$905,806—must be used to reduce AVS's allowable interest expense.

AVS timely appealed to BHA. BHA held an administrative hearing and issued an adjudication on October 4, 2012. BHA found that AVS's withdrawal of all of the money from its funded depreciation account, including $905,806 in investment income, to fund its CEO's retirement package did not fall within any of the ex-

ceptions to the investment income offset requirement in section 226.4.B of HIM–15. Therefore, BHA held that the investment income must be offset from AVS's allowable interest expense. BHA further held that nothing in HIM–15 or other applicable laws permits AVS to avoid the offset requirement by making a subsequent deposit into another restricted account. By final order dated April 17, 2013, the Secretary of DPW affirmed BHA's decision. AVS timely appealed from that decision.[3]

On appeal, AVS asserts that DPW misinterpreted and misapplied the applicable regulations and acted arbitrarily and capriciously in refusing to allow AVS to cure the error relating to its use of restricted investment income. We disagree.

▮ AVS concedes that it used the money from its funded depreciation account for a purpose not recognized by HIM–15. AVS claims, however, that it should be permitted to "cure" its non-conforming use by placing the money into a restricted capital account. AVS argues that allowing the transfer to a restricted capital account would not cause DPW any demonstrable harm. While that may be true, we con-

---

2. DPW's regulation at 55 Pa.Code § 6211.79(q) requires that a funded depreciation account be maintained in accordance with the provisions of HIM–15. Section 226.4.B of HIM–15 states in relevant part:

*Withdrawals from the Funded Depreciation Account.*—Because deposits in the funded depreciation account may be used for a variety of purposes, the following provisions apply:

. . .

B. *Withdrawals for Other Than the Acquisition of Depreciable Assets Used to Render Patient Care or for Other Patient Care–Related Capital Purposes and Investments.*—

. . .

When funded depreciation is used by the provider for *other than* (1) the acquisition of depreciable assets used to render patient

care; (2) investments; (3) loans to the general fund for current operating costs related to patient care; or (4) other capital purposes as described in § 226, *the investment income earned on these funds while on deposit in the funded account shall be used to reduce allowable interest expense incurred during all cost reporting periods subject to reopening.*

HIM–15 § 226.4.B (emphasis added).

3. Our review of a final administrative order is limited to determining whether constitutional rights were violated, whether the necessary factual findings are supported by substantial evidence, or whether an error of law was committed. *See Lancashire Hall Nursing & Rehabilitation Center v. Department of Public Welfare*, 995 A.2d 540, 542 n. 1 (Pa.Cmwlth. 2010).

clude that DPW properly disallowed the transfer. Nothing in HIM–15 or other applicable regulations permits a provider to avoid the investment income offset requirement of section 226.4.B of HIM–15 by making a subsequent deposit into another restricted account. Section 226.4.B's language is clear and directly on point.

Next, AVS asserts that HIM–15 is neither relevant nor controlling in this case because Chapter 6211 of DPW's regulations authorizes the transfer of investment income into a restricted capital account. Specifically, AVS claims that DPW's regulations at 55 Pa.Code §§ 6211.81(h) and 6211.85(b) afford ICF/ID providers flexibility in establishing and maintaining restricted accounts and using earned investment income.

Contrary to AVS's assertion, HIM–15 does, in fact, govern this case. Section 6211.79(q) of DPW's regulations states that "[t]o qualify for treatment as a funded depreciation account, the funds shall be clearly designated in the provider's records as funded depreciation accounts *and shall be maintained in accordance with the provisions of HIM–15.*" 55 Pa.Code

§ 6211.79(q) (emphasis added). Here, AVS demonstrated that the funds at issue were specifically earmarked as "funded depreciation." (DPW's Findings of Fact, No. 13.) Thus, the requirements of HIM–15 apply.

█ Moreover, it is undisputed that AVS used its funded depreciation account for a purpose that is not one of the recognized exceptions in section 226.4.B of HIM–15. Therefore, we conclude that AVS's investment income must be offset from its allowable interest expense.

Accordingly, we affirm.

*ORDER*

AND NOW, this *8th* day of *January,* 2014, we hereby affirm the April 17, 2013, final order of the Secretary of the Department of Public Welfare.